Bell v. Texas Dep't of Human Services 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00594-CV







Carol Anderson Bell and CALAB, Inc., Appellants



v.



Texas Department of Human Services, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT


NO. 94-11213, HONORABLE JOSEPH H. HART, JUDGE PRESIDING








 Appellants Carol Anderson Bell and CALAB, Inc. appeal a judgment of the district
court affirming an order of the Texas Department of Human Services ("TDHS"), appellee. 
Appellants challenge the judgment in two points of error contending that appellants did not receive
due process at the agency level and that the agency's decision is not supported by substantial
evidence. We will affirm the judgment of the district court.

FACTUAL AND PROCEDURAL BACKGROUND


 TDHS is responsible for administering the Medicaid Intermediate Care Facilities
for the Mentally Retarded Program ("ICF-MR"), which operates under Title XIX of the Social
Security Act and encourages the integration of mentally retarded people into the community by
placing them in group homes operated by licensed providers. The program is voluntary, and
providers agree to provide room and board, active treatment training, necessities, and health care to eligible residents in compliance with federal and state rules, regulations, and conditions of
participation, in return for vendor payments from TDHS. Each ICF-MR facility and provider is
licensed annually in accordance with state licensing requirements.

 TDHS uses surveys to monitor provider compliance with over 400 regulations. 
Deficiencies discovered through the surveys that potentially endanger resident health and safety
or compromise active resident-treatment programs and violate a condition of participation may
result in an adverse action being taken against the provider. Adverse actions may include vendor
holds, termination of certification on either a 23-day or 90-day track, or contract cancellation. (1) 
If an adverse action is taken against a provider, the provider has the right to seek judicial review
of the agency decision.

 In addition, TDHS has the power to sanction a provider or a provider's employee
who is responsible for abuse of the ICF-MR program. TDHS rules define "abuse" as:



Provider practices that are inconsistent with sound fiscal, business, or medical
practices and that result in unnecessary program cost or in reimbursement for
services that are not medically necessary; do not meet professionally recognized
standards for health care; or do not meet standards required by contract, statute,
regulation, or previously sent interpretations to the provider of any of the items
listed.



40 Tex. Admin. Code § 79.2111 (West 1996). Examples of specific abuses for which TDHS may
impose sanctions include:



 (5) failing to provide and maintain quality services to Medicaid recipients
within accepted medical community standards or standards required by statute,
regulation, or contract;

 (6) failing to comply with the terms of the Medicaid contract or provider
agreement, assignment agreement, the provider certification on the Medicaid claim
form, or regulations published by the department;

. . . .

 (11) failing to meet standards required for licensure or required by state or
federal law, department rule, provider agreement, or provider manuals for
participation in the Medicaid Program;

. . . .

 (14) failing to correct deficiencies in provider operations after receiving
written notice of them from the department or its authorized agents;

 (15) engaging in any negligent practice resulting in death, injury, or
substantial probability of death or injury to the provider's patients and to persons
who receive or benefit from the provider's services;

. . . .

 (21) failing to comply with Medicaid policies, published Medicaid bulletins,
policy notification letters, provider policy or procedure manuals, contracts,
statutes, rules, regulations, or previously sent interpretations to the provider of any
of the items listed.


40 Tex. Admin. Code § 79.2105 (West 1996).

 For the above cited abuses, TDHS may impose the sanction of exclusion from
participation in Title XIX and Title XX programs for a specified period of time. 40 Tex. Admin.
Code § 79.2112 (West 1996). Sanctions may also be applied against "affiliates" of a provider if
the affiliate knew of or approved the misconduct that caused the violation, failure, or inadequacy
of performance within the course of the affiliate's duty. 40 Tex. Admin. Code § 79.2113 (West
1996). Affiliates are defined as "[p]ersons associated with one another so that any one of them
directly or indirectly controls or has the power to control another in whole or in part." 40 Tex.
Admin. Code § 79.2111 (West 1996). TDHS generally must send the provider prior written
notice of its intent to impose an exclusion sanction and include a time frame for the provider to
take action necessary to correct the problems. 40 Tex. Admin. Code § 79.2115 (West 1996). 
Such notice is not required, however, to sanction "any conduct or omission of conduct by the
provider that indicates a pattern of repeated violations of the Texas Medicaid Program." 40 Tex.
Admin. Code § 79.2115(a)(5) (West 1996).

 By letter dated June 30, 1993, TDHS notified Bell that she was excluded from
participating in any contracts, associations, or affiliations in Social Security Act Medicaid, Title
XIX and Social Services Block, Title XX programs, individually, or through any corporate entity,
including Calab, Inc., for ten years effective July 15, 1993. The exclusion sanction was taken
against Bell as an affiliate, registered agent, director, and/or officer of Anderson Goodman, Inc.,
Goodman-Wade Enterprises, Inc., Anderson-Goodman-Wade Enterprises, Inc., Functional
Living, Inc., Exceptional Living, Inc., and Special Homes, Inc. (collectively "AGW") for abuse
of the ICF-MR program. The exclusion was based on claims of abuse stemming from a pattern
of compliance problems on the part of homes owned by AGW from October 1988 through June
30, 1993. The pattern of abuse alleged by TDHS included 73 vendor hold actions, 10 contract
cancellation/termination actions and 172 "other contract cancellation/termination actions," which
were "discontinued prior to cancellation/termination due to eventual correction of deficiencies."

 Bell severed her relationship with AGW on January 1, 1993, and thereafter formed
Calab. Accordingly, TDHS did not hold her responsible for any deficiencies in AGW homes
from January 1, 1993 through June 30, 1993. The letter informed Bell of her right to appeal the
personal and corporate exclusion actions and contract cancellation actions.

 Bell appealed personally and for Calab, which was the purchaser of ten homes from
AGW. Between November 1993 and March 1994, TDHS conducted a hearing which lasted a
total of twelve days. The administrative law judge reduced Bell's period of exclusion from ten
to three years, commencing July 15, 1993 and ending July 15, 1996, and affirmed the decision
of TDHS. On judicial review, the district court affirmed the agency order.



DISCUSSION


 Appellants' first point of error states: "The district court erred in finding that
appellants were afforded due process at the agency level." Specifically, appellants assert that due
process was lacking because (1) the State never gave notice to appellants that deficiencies or
adverse actions reported in or taken as a result of surveys of ICF-MR Program homes could be
cumulated to result in sanctions, even though the deficiencies might have been corrected or the
adverse actions averted, (2) the State never defined any criteria which would constitute a "pattern
of abuse," and (3) during the agency hearing, without prior notice to Bell, the State changed the
scope of the course of conduct that was alleged to constitute a pattern of abuse as to Bell.

 TDHS contends that appellants have waived this point of error because they failed
to raise the issue in their motion for rehearing. To preserve error for judicial review, the
complaint must first be urged in the motion for rehearing filed with the agency. See Tex. Gov't
Code Ann. § 2001.145 (West 1996); Dolenz v. Texas State Bd. of Medical Examiners, 899
S.W.2d 809, 811 (Tex. App.Austin 1995, no writ). A motion for rehearing must "be
sufficiently definite to apprise the regulatory agency of the error claimed and to allow the agency
opportunity to correct the error or to prepare to defend it." Suburban Util. Corp. v. Public Util.
Comm'n, 652 S.W.2d 358, 365 (Tex. 1983). Accordingly, this Court has held that a motion for
rehearing must, as to each contention, set out (1) the particular ruling or action of the agency that
the movant asserts was erroneous, and (2) the legal basis on which the claim of error rests. 
Dolenz, 899 S.W.2d at 811; Morgan v. Employees' Retirement Sys., 872 S.W.2d 819, 821 (Tex.
App.Austin 1994, no writ).

 In the present case, the only portion of appellants' motion for rehearing that
remotely resembles any of the arguments in point of error one is the following paragraph:



 Petitioner's fundamental request for rehearing concerns the denial of an
opportunity to correct and warning as required under the Exclusion Rule. Even
if all of the findings of fact are taken as true, the Rule requires a warning and an
opportunity to cure before an exclusion is taken. The rule only excepts situations
in which there is a pattern of excludable actions. In this instance the pattern is the
substantive action. No one has maintained or suggested that any individual act or
smaller collection of acts support the exclusion action. It is the totality or pattern
of action that constitutes the substantive abuse. This is the first pattern identified
under the Rule and is the only basis for the Exclusion. In order to justify the
limitation in notice, Respondent must show that there was a repeated pattern of the
substantive offense or a pattern of abuse. It is improper to impose an exclusion
action where the provider has never been notified of the Agency's contention of
abuse.


 The above-quoted portion of appellants' motion for rehearing is not sufficiently
definite to have apprised TDHS that appellants were complaining of an infringement of any
constitutional right to due process of law. Thus, appellants could only have been complaining
about a denial of process due them under a statute or rule. Indeed, the language of appellants'
motion for rehearing indicates that they were complaining that they did not receive the process
expressly guaranteed them by TDHS's "exclusion rule," i.e., 40 Tex. Admin. Code
§§ 79.2101-.2119 (West 1996). Specifically, appellants' motion for rehearing argues that TDHS's
rule gives them a right to receive "a warning and an opportunity to cure" before they can be
sanctioned. Appellants' motion recognized, however, that the rule does not require advance
notice in cases of "a pattern of excludable actions." This phrase was obviously a reference to rule
79.2115, which provides:


(a) Except in the following circumstances, the department sends the provider prior
written notification about its intent to impose an exclusion sanction and includes
a time frame for the provider to take action necessary to correct the problem areas:

. . . .

 (5) any conduct or omission of conduct by the provider that indicates a
pattern of repeated violations of the Texas Medicaid Program;

40 Tex. Admin. Code § 79.2115(a)(5) (West 1996). A portion of appellants' first point of error
argues that TDHS did not give appellants the notice and opportunity for correction required by
rule 79.2115, i.e., that TDHS did not follow its own rule. We conclude, therefore, that appellants
have preserved this complaint for judicial review.

 The contention that appellants preserved appears to be that even if TDHS could
prove there was a pattern of abuse, the violations did not rise to the level of being a "repeated
pattern"; therefore, TDHS should have given appellants notice and a chance to correct the
problems prior to imposing an exclusion. We do not agree. The rule allows TDHS to impose
an exclusion without prior notice in the event of a "pattern of repeated violations." Id. We do
not construe the rule to require TDHS to first give a provider notice that a pattern of abuse exists,
such that TDHS would be authorized to impose exclusion without notice only after the same
pattern was repeated. We conclude that appellants received all the notice they were entitled to
under the agency's rule. Accordingly, we overrule point of error one. (2)

 In point of error two, appellants assert that the record does not contain substantial
evidence to support the agency decision. In conducting a substantial-evidence review, we must
first determine whether the evidence as a whole is such that reasonable minds could have reached
the conclusion the agency must have reached in order to take the disputed action. Texas State Bd.
of Dental Examiners v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied, 490 U.S. 1080
(1989); Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453
(Tex. 1984). We may not substitute our judgment for that of the agency and may consider only
the record on which the agency based its decision. Sizemore, 759 S.W.2d at 116. The appealing
party bears the burden of showing a lack of substantial evidence. Charter Medical, 665 S.W.2d
at 453. The appealing party cannot meet this burden merely by showing that the evidence
preponderates against the agency decision. Id. at 452. If substantial evidence would support
either affirmative or negative findings, we must uphold the agency decision and resolve any
conflicts in favor of the agency decision. Auto Convoy Co. v. Railroad Comm'n, 507 S.W.2d
718, 722 (Tex. 1974).

 The record contains substantial evidence to support the agency decision that (1) the
licensed provider, AGW, had repeated violations which formed a pattern of abuse, (2) Bell was
an affiliate of AGW during the pattern of abuse, and (3) Bell knew of or approved the misconduct
within the course of her official duty.



AGW's Pattern of Abuse

 TDHS originally cited a pattern of abuse on the part of AGW and its affiliates for
approximately a four-and-a-half year period. During the hearing, TDHS revised the list of
adverse actions it was relying on to support Bell's exclusion. The revised list, from which the
administrative law judge made her decision, contained 58 vendor holds and two contract
cancellations among 34 houses for a two-and-a-half year period from 1989 to 1992.

 The record reflects that homes within AGW throughout the state were repeatedly
cited for deficiencies that endangered resident health or safety or compromised resident active
treatment and violated a condition of participation. The number of deficiencies for AGW were
well above the norm for other ICF-MR providers in Texas. By 1992, AGW owned a total of
sixty-one homes, comprising nine percent of the existing 647 ICF-MR facilities in Texas. From
October 1988 to October 1992, 512 facilities (79%) had never had a hold recommended, while
135 facilities (21%) received recommendations for vendor holds. Of these 135 facilities, thirty-three were owned by AGW (24.44%) and had received fifty-three (31.74%) of the 167 vendor
hold recommendations. Additionally, of the twenty-six Texas facilities that received two or more
vendor hold recommendations, fifteen (56.69%) were owned by AGW. Furthermore, seven
Texas facilities received three or more vendor hold recommendations; of these, five (71.43%)
were owned by AGW. Out of sixty-one AGW homes, five had three vendor holds, ten had two
vendor holds, and eighteen had one vendor hold.

 From October 1988 to October 1992, a total of fifteen facilities received
recommendations for 23-day "fast track" terminations. Five of those facilities (33%) were owned
by AGW. Ninety-eight percent of the facilities in Texas (633) have never received a
recommendation for 23-day "fast track" termination. From October 1988 to September 1992, ten
facilities had contracts cancelled; five of those facilities (50%) were owned by AGW. Each of
the remaining five facilities was owned by an unrelated corporation. When the total number of
vendor holds and termination recommendations AGW received during this time period are
compared solely with other 6-bed facilities (there were 558), the disparity is even greater.

 Deficiencies repeatedly cited for endangering resident health and safety included
lack of adequate food, lack of adequate and safe transportation, poor sanitation, lack of medical
care, and lack of basic necessities including soap, razors, and clothing. Deficiencies cited for
failure to meet resident needs in active treatment included program plans not being developed to
meet individual resident needs, functional assessments not being made, and training programs and
behavior modification plans not being reviewed and revised as needed. Additionally, the homes
failed to provide continuous active treatment programs because of lack of Qualified Mental
Retardation Professionals ("QMRPs"), failure of available QMRPs to monitor client programs,
lack of adequately trained support staff, use of drugs to control inappropriate behavior not
approved by the interdisciplinary team, and failure of interdisciplinary teams to meet annually. 
Deficiencies cited for violation of a condition of participation included failure of the governing
body to maintain and implement policies for the resident's health and safety (i.e. lack of policies
for infection control, failure to maintain a safe environment for the residents, failure to conduct
regular fire drills), lack of proper facility staffing (i.e. lack of QMRPs, inadequately trained direct
care staff), failure to provide proper health care services (i.e. failure to provide regularly
scheduled check-ups, failure to regulate drug intake of residents, failure to maintain resident
medical records), failure to provide a suitable physical environment, failure to provide adequate
supervision, failure to protect client rights and privacy, and abuse and neglect. We conclude that
the evidence supports the agency's determination that the combination of repeated deficiencies
over time within AGW homes throughout the state constituted a pattern of abuse.



Bell's Status as an Affiliate During the Pattern of Abuse

 TDHS excluded Bell on the basis that she was an affiliate of AGW while the
corporations were engaging in practices within the homes that formed a pattern of abuse. Bell
states that in February 1988 she began managing six facilities in Lubbock owned by Anderson-Goodman-Wade Enterprises, Inc. She became the administrator of those facilities after her ex-husband, Foy Anderson, resigned. She also assisted with the accounting and cost reporting for
Special Homes, Inc. Anderson Goodman, Inc. issued Bell 25% of its shares of stock and she
received an additional 25% in June 1988 as part of her divorce settlement. In November 1988,
Bell acquired a 25% interest in Anderson-Goodman-Wade Enterprises, Inc. The 1987 Franchise
Tax Report for Anderson Goodman, Inc. listed Bell as Vice-President. The articles of
incorporation for Anderson-Goodman-Wade Enterprises, Inc. listed Bell as a director. Also in
1988, Bell was given the titles of Vice-President and Secretary for Special Homes, Inc. and was
listed as a director in the Franchise Tax Report.

 In 1989, Bell began reviewing general business operations, wage and hour claims,
census building, cost reporting, payroll, personnel, and accounting for AGW. She continued to
manage the homes in Lubbock and was the managing officer of Anderson-Goodman-Wade
Enterprises, Inc. In the first quarter of 1989, she worked on improving cost reporting in the
Special Homes, Inc. facilities. She received a salary from Anderson-Goodman-Wade Enterprises,
Inc. and Special Homes, Inc. In August 1989, she began working on a year-long project to
restore programs in nine facilities in Houston owned by Goodman-Wade Enterprises, Inc. after
five of the facilities were placed on vendor hold.

 In 1990, she began working for Lee Goodman Investments, Inc., d/b/a Special
Services Management ("SSM"). The record reflects that SSM was a corporation responsible for
the overall management of AGW. As Vice-President of SSM, Bell hired regional directors,
managed accounting, cost reporting, and wage and hour compliance, supervised personnel
compliance, policy development, and developed training seminars. In addition, she was
responsible for new facility development. In 1991, Bell became President of SSM and continued
to work on development of new facilities and financial resources until she terminated her
relationship with AGW at the end of 1992.

 Lee Goodman, founder, CEO, and primary owner of AGW, testified that Bell, in
her position as President of SSM, had authority over all AGW homes and thus the ability to
directly control their daily operation. In addition, TDHS introduced numerous documents
reflecting that Bell represented herself as Director of Operations for ICF-MR operations for SSM
(as early as September 1989), Vice-President and Assistant Secretary of Exceptional Living, Inc.,
Vice-President of Goodman-Wade Enterprises, Inc., and President of Anderson-Goodman-Wade
Enterprises, Inc. We conclude the record contains sufficient evidence to support the agency's
finding that Bell was an affiliate of AGW during the period of abuse. 

Bell's Knowledge of or Approval of the Abuse

 TDHS's exclusion charged that, in her various positions of authority in AGW, Bell
knew of or approved the practices constituting the pattern of abuse. In 1989, Bell requested
TDHS to notify her of adverse actions against AGW facilities. TDHS introduced evidence that
Bell, as Director of Operation for SSM, received these notifications from the end of 1989 through
1992.

 Cindy Kenneally, director of the ICF-MR program for TDHS, testified that she
personally spoke with Bell regarding survey results and deficiencies cited after nine AGW homes
in Houston were surveyed. From her dealings with Bell, Kenneally believed that she was the
person responsible within AGW for its ICF-MR program. Bell herself indicated her direct
involvement in attempting to correct cited deficiencies in AGW homes. Additionally, numerous
individuals who were supervised by Bell indicated that her positions of authority within the
organization gave her direct knowledge of the adverse actions brought against AGW homes. We
conclude the record contains sufficient evidence to support the agency finding that Bell had
knowledge of or approved the misconduct constituting abuse in the AGW homes. Accordingly,
we overrule point of error two.

CONCLUSION


 Having overruled appellants' points of error, we affirm the judgment of the district
court.



 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Jones and B. A. Smith

Affirmed

Filed: August 28, 1996

Do Not Publish
1.   A provider's contract is cancelled after a facility has received three vendor holds in
an eighteen month period.
2.   Other than the contention discussed above, appellants waived the complaints
asserted in point of error one because they were not raised in appellants' motion for
rehearing. Nonetheless, we have reviewed the merits of those complaints and do not
believe that appellants suffered a deprivation of due process.